**2017 UT App 183**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BILL ROBERT THOMPSON,
Appellant.

Opinion
No. 20150721-CA
Filed September 28, 2017

Third District Court, West Jordan Department
The Honorable L. Douglas Hogan
No. 141400758

Teresa L. Welch, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
DAVID N. MORTENSEN and DIANA HAGEN concurred.[1]

TOOMEY, Judge:

¶1     Bill Robert Thompson was intoxicated and enraged when
he assaulted and threatened people at his house, then got behind
the wheel of his full-sized pickup truck and sped away. He
eventually ran a red light, hitting seven other vehicles, injuring
several people and killing another. He was convicted of a
number of crimes and appeals some of those convictions on two

---

1. After hearing the arguments in this case, Judge J. Frederic
Voros Jr. retired and did not participate in the consideration of
the case. Judge Diana Hagen, having reviewed the briefs and
listened to a recording of the oral arguments, substituted for
Judge Voros and participated fully in this decision.

grounds: first, he contends that the trial court erred in permitting the introduction of what he characterizes as irrelevant and prejudicial evidence against him, and second, he argues that the evidence was insufficient to support his conviction for first degree murder.[2] We affirm.

BACKGROUND

¶2     Thompson was sound asleep in bed early one evening when his wife (Wife) wakened him by spraying water on him.[3] Wife was distressed after discovering "inappropriate" and "extremely flirty" text messages on Thompson's phone. And because she found vomit on the bedsheets, she suspected that he had been drinking alcohol. Initially, she attempted to waken Thompson by shaking him but resorted to spraying him with water when he remained unresponsive.

¶3     Thompson woke up angry and agitated. The couple argued about the text messages, then quarreled about Thompson's alcohol consumption. As the argument continued, a friend (Friend) who was staying with them emerged from the basement and saw Wife holding the couple's three-year-old son (Son). Wife told Friend that Thompson had "been drinking" and was "drunk again." Wife put down Son, and Friend picked him up as Thompson chased Wife around the kitchen table. Thompson pointed at Friend, looked at Wife, and said, "You

---

2. Thompson was convicted of first degree murder under a theory of depraved indifference. *See* Utah Code Ann. § 76-5-203(2)(c) (LexisNexis 2012).

3. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (citation and internal quotation marks omitted).

don't think I'll fucking hit her?" Thompson then "smacked" Friend and "bloodied [her] nose." He hit her head "four or five times" as she continued to hold Son.

¶4     Wife ran out of the house, and Thompson chased her. Friend also raced outside, still carrying Son, and was attempting to get to a neighbor's house when Thompson grabbed her arm and spun her around, causing her to fall to the ground. As Friend shielded Son's head, Thompson repeatedly hit her head until she broke free and ran toward a neighbor's house.

¶5     As Friend fled, a man, J.P., approached Thompson to inquire about what had happened.[4] Thompson directed his attention toward J.P., "angrily shouting" at him and repeatedly yelling, "[W]ho are you?" He pushed J.P. and punched him in the face, prompting J.P. to wrestle Thompson to the ground. As the men struggled, Thompson called J.P. names and threatened him: "[Y]ou're a little bitch, you're a little bitch, and I'm going to kick your ass, you little bitch." J.P. smelled alcohol on Thompson, and Thompson's speech was slurred. Several neighbors eventually intervened to separate them. One of the neighbors called 911, and Thompson told her, "Snitches get stitches you fucking pu[ta]."

¶6     Thompson returned to his own house and got into his truck, saying to the neighbors, "You're going to fucking die." Thompson drove away at high speed, "fishtailing" the truck, making its tires squeal, and sending "black smoke" pouring out of the exhaust pipe as he accelerated down the street. On his way out of the neighborhood, Thompson noticed a stop sign and at the last second "slammed on the brakes," and then continued on.

¶7     He drove onto the freeway, where he encountered two teenage girls, K.R. and S.B., in a small car. They noticed

---

4. J.P. was visiting his mother, who lived near Thompson.

Thompson driving in the emergency lane, avoiding rush-hour traffic. K.R. and S.B. exited the freeway, lost their way, and then found themselves on a frontage road traveling behind Thompson's truck. K.R., who was at the wheel, thought Thompson was intoxicated because his driving was "kind of crazy" and his speed varied. S.B. observed the truck "drift into" oncoming traffic, causing an oncoming car to swerve out of the way, and nearly hitting another.

¶8     Still following Thompson's truck on the frontage road, the teenagers reached a dead end with a cul-de-sac that allowed vehicles to turn around. K.R. pulled to the side of the road while Thompson maneuvered his truck. He turned it toward the girls' car, which had suddenly stalled. They called 911 as Thompson and his truck accelerated in their direction, then slowed and "bumped" their car, leaving "a couple of little dents." Thompson backed up, then hit the car again, "laughing in amusement," before he sped away "recklessly and fast." Moments later, the girls heard a loud crashing noise. Shortly thereafter, K.R.'s parents picked them up, and as they drove by the intersection of 12300 South and Lone Peak Parkway, the girls observed a multi-car accident and saw Thompson's truck in the wreckage.

¶9     After Thompson left the cul-de-sac, he continued to drive erratically and "really fast," and he was "increasing his speed." Moments later, Thompson negotiated a nearly 90-degree curve in the road at freeway speed and headed toward a busy intersection. As Thompson approached the intersection at 12300 South and Lone Peak Parkway, he continued to accelerate despite having a red light in his direction.

¶10    Video footage from a nearby gas station showed that the traffic light had been red for 29 seconds before Thompson's truck went through the intersection, and another 78 seconds elapsed before it turned green. An inspection of the airbag control modules from Thompson's truck, which convey

information about the truck's "throttle, RPM, brake switch, [and] accelerator pedal," revealed that the gas pedal had been "pushed as far to the floor as possible" when the truck entered the intersection. It was traveling 68 miles per hour "2.5 seconds prior to the crash," then 63 miles per hour two seconds before the crash, and then slowed to 62 miles per hour at .5 seconds before the crash. But during the half second before impact, Thompson slightly increased speed to 62.78 miles per hour. Thompson never touched the brakes in the seconds before the collision, and he did not attempt any evasive maneuvers.

¶11    As Thompson ran the red light, his 7,500-pound truck, with its "lifted suspension," crashed into the driver's side door of the victim's (Victim) car, sending Victim's car "flying through the air," hitting the top of the vehicle next to it as it soared over.[5] Victim's car landed on its wheels and "backed into a pole at the corner of the intersection." The driver's side of Victim's car "looked like it was gone," and the car "looked like half a car." The truck penetrated roughly half-way through Victim's car, leaving Victim unconscious and mortally injured[6] and her daughter seriously injured.[7] The force of the impact separated Victim's skull from her vertebral column, severing her brain stem. The impact also tore her aorta from her heart, fractured most of her ribs, lacerated her diaphragm, liver, spleen, left kidney, and large intestine, and punctured her lungs.

---

5. In the course of plowing through the intersection, Thompson's truck collided with other vehicles as well.

6. Victim likely died on impact.

7. Victim's daughter was unconscious, her head was bleeding, and she had "at least two" compound fractures in her legs. She was missing a significant amount of skin and muscle from her legs, had a fractured skull and wrist, and her jaw was broken in two places. She also suffered a traumatic brain injury.

¶12    A police officer who happened to be on the scene at the time of the crash noticed that Thompson was "bleeding pretty heavily from his head" and "wasn't breathing correctly." Another officer testified Thompson had "watery, red" eyes, dilated pupils, slurred speech, and a dazed look. A paramedic and an emergency medical technician, who attended to Thompson after the crash, testified that in response to their questions, Thompson repeatedly responded, "[F]uck you" and raised his middle finger. He attempted to grab at the paramedics as they started an intravenous line, put him on oxygen, and attached a cardiac monitor. His belligerence, anger, and combativeness initially made the paramedics consider whether he had a head injury, but ultimately they concluded that he was drunk.

¶13    Blood drawn from Thompson later that evening showed a blood alcohol content of .22 grams per 100 milliliters. The lab test also showed an "indication" of chlordiazepoxide, an anti-anxiety drug with a sedative effect that can amplify the effect of alcohol, but its presence was never confirmed.

¶14    Thompson was charged with a number of crimes, and eventually the case proceeded to a jury trial. During trial and over Thompson's objection, evidence was introduced of the content of a text message conversation between Thompson and a woman (Woman) who was not his wife. These were transmitted over a 90-minute period on the day of the crash, ending approximately two hours before Wife confronted Thompson.

    Thompson: U alive (2:30 pm)

    [Woman]: Haha. Yup (2:32 pm)

    Thompson: Wanna be naked (2:32 pm)

    [Woman]: Want me to be? Oh wait, yours was not
    a question. (2:41 pm)

Thompson: Last time was pretty awesome (2:41 pm)

[Woman] YOU want to be naked. Lol[.] Was I naked?? (2:42 pm)

Thompson: You had just got done with girl's best friend (2:43 pm)

[Woman] Really?? Wow (2:45 pm)

Thompson: Don't be afraid[.] You think I'm a V tease (2:46 pm)

[Woman] No. No. (2:47 pm)

Thompson: Wanna??? (2:50 pm)

[Woman] I'm driving. So I can't text (2:51 pm)

Thompson: Can you touch (2:51 pm)

[Woman]: And . . . . I'm flattered but I can't[]. Kinda wish I could. I'm sure it would be fun[.] I can speak in text (2:53 pm)

Thompson: I've seen you spe[ak] text one of the hottest conversation[s] I've ever had (2:55 pm)

[Woman]: Are you sure you have the right person? (2:56 pm)

Thompson: Yes I came to your house[,] you answered "come in[.]" [A]s I entered you were slowly putting on your robe with commercial grade vibrator by your feet[.] [Y]ou said sorry[,] I said no[,] my pleasure[.] I also have a great 8x 10 of your perfect body (3:02 pm)

[Woman]: 8x 10? (3:04 pm)

Thompson: Well phone pic[.] 8x 10 just sounded good (3:05 pm)

[Woman]: Lol (3:05 pm)

Thompson: You even fed me cereal and told me you loved me (3:07 pm)

Thompson: Cat got you by the pussy (3:12 pm)

Thompson: Was that too much (3:12 pm)

Thompson: Guess so sorry (3:32 pm)

[Woman]: A[m] on the phone, still (4:00 pm)

¶15    Wife read only a couple of these texts, and on this basis Thompson's counsel argued that the messages were not relevant. Additionally, he argued that the messages were "more prejudicial than probative."

¶16    On the second day of trial, Thompson pleaded guilty to some of the charges: one count of driving under the influence of alcohol/drugs, a third degree felony; seven counts of driving under the influence of alcohol/drugs, a class A misdemeanor; and one count of domestic violence in the presence of a child, a class B misdemeanor. The jury convicted him of three others: murder, a first degree felony, and two counts of aggravated assault, a third degree felony. Thompson filed a timely appeal.

ISSUES AND STANDARDS OF REVIEW

¶17    Thompson advances two arguments on appeal. First, he contends the district court erred by admitting the contents of the text message conversation he had with Woman. "We afford

district courts a great deal of discretion in determining whether to admit or exclude evidence and will not overturn an evidentiary ruling absent an abuse of discretion." *State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981 (citation and internal quotation marks omitted).

¶18 Second, Thompson contends sufficient evidence does not support the jury's verdict that Thompson committed first degree murder, particularly in light of his voluntary intoxication defense. "When considering an insufficiency-of-the-evidence claim, we review the evidence and all reasonable inferences in the light most favorable to the jury's verdict" and reverse the conviction "only if we determine that the evidence is so inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt" as to whether the defendant committed the crime. *State v. Kennedy*, 2015 UT App 152, ¶ 39, 354 P.3d 775.

ANALYSIS

I. Admissibility of the Text Messages

¶19 Thompson contends the district court erred by admitting the text message conversation he had with Woman because it was "irrelevant and more prejudicial than probative."

A. Relevance

¶20 Rules 401 and 402 of the Utah Rules of Evidence govern relevancy. "Irrelevant evidence is not admissible." Utah R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *Id.* R. 401. Thompson claims that "the content of the messages did not, and could not, assist the fact finder in determining whether [he] acted with depraved indifference." But before a jury may

convict someone of depraved indifference murder, it must find that the person acted knowingly. *See* Utah Code Ann. § 76-5-203(2)(c) (LexisNexis 2012) (stating that criminal homicide constitutes murder if "acting under circumstances evidencing a depraved indifference to human life, the actor knowingly engages in conduct which creates a grave risk of death to another and thereby causes the death of another").

¶21 Critical to this appeal, in making his defense at trial, Thompson raised the affirmative defense of voluntary intoxication, arguing he was so intoxicated that he could not form the requisite mental state. *See id.* § 76-2-306. Thompson also argued that on the day of Victim's death, he was suffering from extreme emotional distress, massive anxiety, and withdrawal symptoms because of a gap in the anti-anxiety medication he was taking. Thus, we must assess the text messages' relevance in light of Thompson's voluntary intoxication defense and his general theory of the case.

¶22 The State contends "the content of the texts was relevant because it showed [Thompson's] mental state just three hours before the fatal crash, which was critical to determining whether [Thompson] acted with depraved indifference, was suffering from extreme emotional distress, and whether the voluntary intoxication defense applied." The State also argues the content of the text message conversation was relevant to show why Thompson's wife "had confronted him just twenty minutes before the fatal crash, thus supporting the inference that [Thompson] may have believed his world [was] coming apart and possibly could have felt that he had nothing to lose." (Second alteration in original) (internal quotation marks omitted). We agree.

¶23 The test for relevance presents a very low bar, and the content of the text message conversation tended to aid the jury in determining whether Thompson acted knowingly, a required

element of depraved indifference murder. *See* Utah R. Evid. 401; Utah Code Ann. § 76-5-203(2)(c). The text messages also tended to aid the jury in determining whether Thompson was so intoxicated that he could not act knowingly. *See* Utah Code Ann. § 76-2-306.

¶24　Thompson further asserts the State's arguments "all suffer from a temporal problem because the content of the text messages show Thompson's state of mind when he wrote the texts, not his state of mind when he was confronted by his wife about them, nor his state of mind when he caused the fatal crash." In support of this argument, Thompson relies on *State v. Maurer*, 770 P.2d 981 (Utah 1989), where our supreme court concluded that statements in a letter sent by the defendant to the victim's father while the defendant was in jail awaiting trial on charges of second degree murder were irrelevant because they spoke to defendant's mental state *after* the commission of the crime, and therefore should not have been admitted. *Id.* at 982–83. But here, the text message conversation occurred *before* the commission of the crimes, just hours before Thompson's drunken rampage. And where Thompson's mental state in the hours leading up to the killing of Victim was directly at issue, the content of the text messages was relevant.

B.　Rule 403 Balancing

¶25　Thompson contends the content of the text messages was unfairly prejudicial and cumulative. Specifically, Thompson argues the text messages were unfairly prejudicial "because they showed him having improper sexual conversations with a woman who was not his wife," which "could have provoked an emotional response from the jury and provoked its instinct to punish or otherwise divert the jury from its task to determine the mental state of the defendant at the time of the killing." (Citation and internal quotation marks omitted.) And he argues the text messages were cumulative because "the State had other

witnesses to testify about [his] state of mind around the time the crash occurred." We first address Thompson's unfair prejudice argument and then turn to his argument that the text messages were cumulative evidence.

¶26 Rule 403 of the Utah Rules of Evidence provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Rule 403 "imposes . . . the heavy burden not only to show that the risk of unfair prejudice is greater than the probative value, but that it 'substantially outweighs' the probative value." *State v. Jones*, 2015 UT 19, ¶ 29, 345 P.3d 1195 (brackets omitted). Indeed, rule 403 is an "inclusionary rule." *State v. Kooyman*, 2005 UT App 222, ¶ 26, 112 P.3d 1252 (citation and internal quotation marks omitted). Evidence is unfairly prejudicial when it has "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Maurer*, 770 P.2d at 984 (quoting Fed. R. Evid. 403 advisory committee's notes). "But even if a trial court improperly admits unfairly prejudicial or cumulative evidence, we will not overturn a jury verdict based on that evidence if the admission of the evidence did not reasonably [affect] the likelihood of a different verdict." *State v. Gonzalez*, 2015 UT 10, ¶ 36, 345 P.3d 1168 (citation and internal quotation marks omitted).

¶27 Rule 403 is, at its heart, a balancing test. *See Maurer*, 770 P.2d at 984. To carry his burden of persuasion, Thompson must show that the text messages' probative value was "substantially outweighed by a danger of . . . unfair prejudice." *See* Utah R. Evid. 403. But Thompson glosses over the text messages' probative value and addresses only the potential risk they may

have had. This is insufficient to carry his burden of persuasion. And in any event, the text messages were probative of whether Thompson acted knowingly or was suffering from extreme emotional distress or anxiety.

¶28   The text messages show that Thompson was able to engage in written conversation, that he was aware enough to build on Woman's responses, that he could recall memories, that he was aware that he might have offended Woman with a few of his messages, and that he appeared to be in a light-hearted and content mood.

¶29   Thompson next argues the text messages were cumulative and unnecessary because other witnesses testified about Thompson's mental state and because "it would have been sufficient for the prosecution to put on evidence that Thompson's wife confronted him about inappropriate text messages." But Wife read only "[a] couple" of the text messages before she confronted Thompson and therefore could not testify about the majority of them. Moreover, the text messages were different in kind from the evidence elicited by the other witnesses who observed Thompson's rampage.

¶30   We are also not convinced that if the district court had refrained from admitting the text messages, there would have been a "likelihood of a different verdict." *See Gonzalez*, 2015 UT 10, ¶ 36 (citation and internal quotation marks omitted). Thompson complains that the text messages depicted him as "a coarse and indecent individual." But the jury heard a great deal of evidence that arguably damaged his character far more than the text messages: for example, assaulting Friend as she held his three-year-old son; threatening the neighbors who tried to intervene; aggressively driving through a residential neighborhood and then into heavy traffic; ramming a small car carrying teenagers as he laughed; and cursing the emergency responders who were attempting to render medical assistance.

¶31   We conclude the district court did not abuse its discretion in admitting the text messages because they were relevant to Thompson's mental state and their probative value was not substantially outweighed by a danger of unfair prejudice.

## II. Sufficiency of the Evidence

¶32   Thompson contends that even when viewing the evidence in the light most favorable to the verdict, "the evidence did not prove that [he] acted with depraved indifference," and "the evidence did not disprove the affirmative defense of voluntary intoxication."

¶33   When reviewing the sufficiency of the evidence, this court does not "sit as a second fact finder." *Salt Lake City v. Miles*, 2014 UT 47, ¶ 10, 342 P.3d 212 (citation and internal quotation marks omitted). Rather, our review "is limited to [ensuring] that there is sufficient competent evidence regarding each element of the charge to enable a jury to find, beyond a reasonable doubt, that the defendant committed the crime." *Id.* (citation and internal quotation marks omitted). "So long as there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made, our inquiry stops." *State v. Ring*, 2013 UT App 98, ¶ 2, 300 P.3d 1291 (per curiam) (citation and internal quotation marks omitted).

¶34   A defendant is guilty of depraved indifference murder if, "acting under circumstances evidencing a depraved indifference to human life, the actor knowingly engages in conduct which creates a grave risk of death to another and thereby causes the death of another." Utah Code Ann. § 76-5-203(2)(c) (LexisNexis 2012). Thompson contends there was insufficient evidence to prove that (A) he acted with depraved indifference to human life, (B) his conduct created a grave risk of death, and (C) he acted knowingly in creating the grave risk of death.

A.      Depraved Indifference to Human Life

¶35    The element of depraved indifference cannot be proved by evidence of "a single, unanticipated tragic result"; depraved indifference "means an utter callousness toward the value of human life and a complete and total indifference as to whether one's conduct will create the requisite risk of death . . . of another." *State v. Standiford*, 769 P.2d 254, 261 (Utah 1988). "The term 'depraved indifference to human life' does not refer to the mens rea, or subjective culpable mental state, of depraved murder, but rather to an objective reasonable person standard as to the value of human life." *Id.* (footnote omitted).

¶36    Through this lens, the question becomes whether a reasonable factfinder could find that driving a large and heavy pickup truck at freeway speeds through a red light and into heavy traffic without applying the vehicle's breaks or otherwise attempting to avoid a collision objectively demonstrated "an utter callousness toward the value of human life." *See id.* We conclude it could.

¶37    Thompson argues that because motor vehicles have great social utility, his conduct did not "rise to the level" of utter callousness. Although it is true that social utility is a factor in determining whether a person has acted with depraved indifference, it is just one factor. Factors a jury may consider include the following: "(1) the utility of the defendant's conduct, (2) the magnitude of the risk, (3) the defendant's knowledge of the risk, and (4) any precautions taken by the defendant to minimize that risk." *State v. Bolsinger*, 699 P.2d 1214, 1220 (Utah 1985).

¶38    Although motor vehicles generally have great social utility, this "vanishes when a driver is intoxicated, on the wrong side of the road, driving at a high rate of speed, and running red lights." David Luria, *Death on the Highway: Reckless Driving as Murder*, 67 Or. L. Rev. 799, 827 (1988); *see also Jeffries v. State*, 169

P.3d 913, 921 (Alaska 2007) ("While there is certainly utility in driving, that utility is, except in rare circumstances, completely negated by the grave danger posed to society by an extremely intoxicated driver."); *Brown v. Commonwealth*, 174 S.W.3d 421, 427 (Ky. 2005) (stating that the social utility of driving a motor vehicle through a red light at a high rate of speed "was nonexistent"). "This type of driver has converted an automobile from a benign, yet powerful, instrument of transportation into a lethal weapon, one often more deadly than a gun." David Luria, *Death on the Highway: Reckless Driving as Murder*, 67 Or. L. Rev. 799, 827 (1988).

¶39   Thompson did not merely cause an accident while driving intoxicated. He ignored speed limits and traffic signals and accelerated into a busy intersection with the traffic light turned red. Moreover, Thompson did nothing to minimize the significant risk of injury that occurs when a motor vehicle collides with another vehicle at a high rate of speed. Thompson did not try to brake or swerve out of the way but instead accelerated his large truck through the intersection with the gas pedal pressed to the floor at the moment of impact.

¶40   We conclude the evidence was sufficient to demonstrate that Thompson acted with depraved indifference to human life.

B.      Grave Risk of Death

¶41   This element requires the jury to find that the defendant created such a risk that there is "a *highly likely probability* that death will result." *State v. Standiford*, 769 P.2d 254, 264 (Utah 1988). "Risk has two dimensions: the likelihood of the potential harm and the magnitude of that harm." *State v. Ricks*, 2013 UT App 238, ¶ 15, 314 P.3d 1033. "This standard is less than what is required for an intentional or knowing murder, but greater than what is required for reckless manslaughter." *Standiford*, 769 P.2d at 264.

¶42    Thompson argues that because "'drunk driving is, at least from a statistical point of view, not all that dangerous,' the 'highly likely probability' of [Victim's] death was absent." (Quoting David Luria, *Death on the Highway: Reckless Driving as Murder*, 67 Or. L. Rev. 799, 828 (1988).) We find this wholly unpersuasive. The conduct to be evaluated is not drunk driving in general but where and how Thompson was driving. This entails analyzing the magnitude and likelihood of injury where a person drives a large truck through a red light at freeway speeds into a busy intersection. Such driving created a high magnitude and likelihood of death.

¶43    We conclude there was sufficient evidence to demonstrate that Thompson's driving created a grave risk of death.

C.    Mens Rea

¶44    To be convicted of depraved indifference murder, the defendant must act knowingly in creating the grave risk of death to another. *Standiford*, 769 P.2d at 263. "That means that to be convicted, a defendant must know the nature of his conduct, must know the circumstances that give rise to the risk of death, and must know that the risk constitutes a grave risk of death." *Id.* A person acts knowingly with respect to his conduct "when he is aware of the nature of his conduct or the existing circumstances. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." Utah Code Ann. § 76-2-103(3) (LexisNexis 2012).

¶45    Thompson contends "his high level of intoxication" prevented him from acting knowingly. Thompson's argument on this element is identical to his argument concerning his voluntary intoxication defense, and we therefore address them together.

¶46   "Voluntary intoxication shall not be a defense to a criminal charge unless such intoxication negates the existence of the mental state which is an element of the offense . . . ." *Id.* § 76-2-306. Thus, intoxication alone is not enough; the defendant must have been so intoxicated that it negated the requisite mental state, in this case, knowingly. Where a jury is instructed on a voluntary intoxication defense, the prosecution must "disprove the existence of affirmative defenses beyond a reasonable doubt." *State v. Drej*, 2010 UT 35, ¶ 15, 233 P.3d 476 (citation and internal quotation marks omitted).

¶47   Thompson argues the State did not "meet its burden of disproving [his] affirmative defense of voluntary intoxication"[8] because his blood alcohol content was nearly three times the legal limit and there was some evidence that he was intoxicated at the time of the incident, evidenced by the altercation at his home and his erratic driving.[9] But it is not enough to show that he was intoxicated.

¶48   In *State v. Burke*, 2011 UT App 168, 256 P.3d 1102, we held that although the defendant had consumed alcohol and was intoxicated at the time of the charged offenses, the evidence was insufficient to entitle him to a voluntary intoxication jury

---

8. As we understand it, the State argues in its brief that Thompson was not entitled to a jury instruction on the voluntary intoxication defense. It does not appear the State contested the jury instruction but rather stipulated to it. Because the State did not object to the instruction, we do not analyze whether Thompson was entitled to it.

9. Thompson also contends that the indication of the presence of chlordiazepoxide, an anti-anxiety drug, in his blood aided in showing he did not act knowingly. But the presence of the drug was not confirmed by the forensic toxicologist because the indication did not "meet [the lab's] acceptance criteria."

instruction on his charge of aggravated sexual abuse of a child. *Id.* ¶¶ 1, 84. We reached this holding despite evidence that the defendant's speech had been slurred, that he looked "glazed-over," and that his father had found a vomit-filled towel left by the defendant. *Id.* ¶ 83. Although there were signs of intoxication, the defendant was "coherent enough to give directions" to his father's house. *Id.*

¶49 Although in the present case the jury was instructed on voluntary intoxication, *Burke* is instructive to our analysis. In both the present case and *Burke*, testimony was elicited that the defendants were intoxicated, that their speech was slurred, and that they had vomited around the time of the offenses. But notwithstanding their intoxication, they appeared coherent and aware of their conduct.

¶50 Here, the State presented enough evidence to carry its burden that, despite his intoxication, Thompson was aware of his actions and knew of their consequences. For example, on his way out of the neighborhood, Thompson saw a stop sign and had the presence of mind to slam on his brakes at the last second to stop his truck. Later, Thompson encountered two teenage girls in their vehicle at the end of a cul-de-sac and showed precision in maneuvering his truck. Twice, Thompson pointed his truck at the driver's side door of the teenagers' vehicle, accelerated, and then slowed right before bumping the vehicle. And as he pulled away, he smirked and laughed at the teenagers, creating an inference that he intended to scare them and knew he had succeeded. Thompson then negotiated several turns, one of which was a 90-degree curve in the road which he traversed at freeway speeds. Just 2.5 seconds prior to the collision, Thompson removed his foot from the accelerator. But one second later, he fully engaged the accelerator and did so through impact. And when paramedics were attending to Thompson after the crash, he did not respond by asking what had happened or by otherwise acting as though he was not

aware of his conduct. Rather, he responded by using offensive language and gestures. Based on this evidence, the jury could reasonably infer that Thompson had the capacity to control his vehicle but instead chose to barrel through a busy intersection knowing that his conduct created a grave risk of death.

¶51   Thompson's text message conversation with Woman just a few hours before the fatal crash also suggests he was aware of his conduct. As we previously discussed, *supra* ¶ 28, Thompson's messages demonstrate that he was able to carry a conversation, that he was aware enough to comprehend and reply to Woman's responses, that he could recall memories, and that he was aware enough that he felt the need to apologize for his inappropriate words. While the evidence did not establish when Thompson began drinking that day, the text messages showed that Thompson was clearheaded just a few hours before the crash. This evidence cast doubt on Thompson's claim that he was so intoxicated that he could not form the requisite mental state for depraved indifference murder.

¶52   On the surface, it may appear contradictory that a person can be intoxicated enough to be convicted of driving under the influence of alcohol but not so intoxicated as to mount a successful voluntary intoxication defense. But driving under the influence of alcohol is a strict-liability crime and therefore does not have a mens rea requirement. *See* Utah Code Ann. § 76-2-102 (LexisNexis 2012) ("An offense shall involve strict liability if the statute defining the offense clearly indicates a legislative purpose to impose criminal responsibility for commission of the conduct prohibited by the statute without requiring proof of any culpable mental state."); *State v. Larsen*, 2000 UT App 106, ¶ 25, 999 P.2d 1252 ("Traffic violations are regulatory type crimes or *malum prohibitum* offenses for which strict liability is generally imposed."); *see also* Utah Code Ann. § 41-6a-502 (LexisNexis 2014) (stating that a person may not operate a vehicle if the person "has sufficient alcohol in the person's body that a

subsequent chemical test shows that the person has a blood or breath alcohol concentration of .08 grams or greater at the time of the test"). More importantly, the voluntary intoxication defense applies only to offenses that require something more than a reckless mental state *so long as* the person is so intoxicated that it negates the requisite mental state. *See* Utah Code Ann. § 76-2-306 (LexisNexis 2012).

¶53    Although Thompson demonstrated he was intoxicated, the State met its burden to prove beyond a reasonable doubt that he was not so intoxicated as to negate his knowing mental state. Therefore, there was sufficient evidence that he acted knowingly in creating a grave risk of death.

¶54    We conclude there was sufficient evidence to convict Thompson of depraved indifference murder and therefore affirm his conviction for murder.

CONCLUSION

¶55    We conclude that the content of Thompson's text message conversation with Woman was properly admitted because it was relevant and because its probative value was not substantially outweighed by any danger of unfair prejudice. We also conclude there was sufficient evidence to convict Thompson of depraved indifference murder.

¶56    Affirmed.

———————