2019 UT App 141

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRANDON PERRY SMITH,
Appellant.

Opinion
No. 20170282-CA
Filed August 22, 2019

Fifth District Court, St. George Department
The Honorable G. Michael Westfall
No. 101501945

Gary W. Pendleton, Mary C. Corporon, and J.D.
Lauritzen, Attorneys for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Brandon Perry Smith appeals his conviction of murder.
We affirm.

### BACKGROUND

¶2     Smith was acquainted with Paul Ashton, who had a
history of violence and dealing drugs. Ashton had two
roommates, Roommate and Boyfriend. While living with
Ashton, Roommate and Boyfriend had been visited by another
individual (Friend) who used illegal drugs with Boyfriend at
Ashton's home. Ashton, who had become a drug informant

following a previous arrest for drug possession with intent to distribute, contacted his law enforcement handler and informed him that he knew of two individuals the police might be interested in investigating. A few days later, Roommate and Boyfriend learned that Ashton was an informant. Boyfriend texted Friend to ask if he would help them move out of Ashton's residence. Friend and his girlfriend (Girlfriend) accompanied Roommate to Ashton's residence while Boyfriend stayed at another friend's home. In an effort to prevent Ashton from knowing that she was aware he was a police informant, Roommate told Ashton that the reason she was moving out so suddenly was that Boyfriend had been arrested.

¶3      Roommate's ruse apparently did not fool Ashton, however, because while Roommate, Friend, and Girlfriend loaded a truck with Roommate and Boyfriend's belongings, Ashton began texting Smith. Ashton told Smith that he needed "a piece" to "defend [himself]" because he had been "labeled a rat." Eventually, Smith agreed to help, arriving at Ashton's residence about forty minutes later with two guns. Smith was wearing his shooting gloves and entered the apartment complex stealthily from the back, anticipating trouble. He gave Ashton one of the two guns, which Ashton put in his waistband. Soon after, Friend and Girlfriend left with a truckload of belongings while Roommate stayed behind to continue packing. Ashton gave Smith a pipe wrapped in electrical tape and told him to knock Roommate out, explaining that "then there would just be two" to deal with when the others returned. Ashton also began cutting lengths from a piece of rope to tie them up with. Smith believed Ashton intended to "[tie] them up and [take] them out, like, in the desert somewhere and then—yeah." Despite Ashton's instructions, Smith did not hit Roommate because he did not think the pipe was "substantial enough" to knock her out.

¶4      When Friend and Girlfriend returned, they and Roommate began loading additional items into the truck. When they could not find Boyfriend's mountain bike, Roommate confronted Ashton and accused him of stealing it. She called him

names and hit him in the face with a plastic tool kit. Ashton and Smith both pulled out their guns. Ashton shot Roommate in the head, killing her instantly. He then shot Friend in the shoulder. Friend fell to the ground and blacked out. By this time, Girlfriend had locked herself in the bathroom, and Ashton yelled at Smith to "go get her."

¶5 Smith broke the bathroom door open and hit Girlfriend in the head thirteen times with the pipe while Ashton waited outside the bathroom. Although Smith initially intended only to knock Girlfriend out, "that didn't work" and she was in "a lot of pain," so "somewhere along the line," Smith concluded that things had "gone too far" and he "might as well just" kill her. He slammed her head into the floor, choked her, and slashed her throat three times with a pocket knife he had brought with him. Ashton and Smith then fled. Girlfriend died from her wounds a short time later.

¶6 In the meantime, Friend had escaped and called the police. Police quickly caught up with Ashton and arrested him. Soon after, Smith turned himself in because he heard that the police were looking for him. At that time, Smith admitted that he had loaned a gun to Ashton but claimed that he blacked out after Ashton shot Roommate and Friend.

¶7 Officers picked up Smith and took him to the police station. Before questioning Smith, the interviewing detective (Detective) advised him of his *Miranda*[1] rights in the following exchange:

> [Detective:] But you understand you do have the right to remain silent, that anything you say can and will be used against you in court? Okay. You

---

1. *Miranda v. Arizona*, 384 U.S. 436 (1966), outlines the warnings police are required to give suspects subjected to custodial interrogation. *Id.* at 479.

have the right to an attorney and to have one present with you while you're being questioned— and if you can't afford one—

[Smith:] [I can't afford] one. [I can't] afford one.

[Detective:] Yeah. The courts will appoint you a lawyer if you really need one, okay?

[Smith:] Okay.

[Detective:] So—

[Smith:] If it came to that or—

[Detective:] Yeah. If it—you know, if it comes to that, but—so keep those in mind, you know, and go ahead and tell me what you want to tell me.

Detective then proceeded to question Smith, who confessed to killing Girlfriend.

¶8 Smith was charged with aggravated murder and aggravated assault.[2] Prior to trial, he moved the court to suppress his police interview on the ground that his *Miranda* rights had been violated. Smith also moved the court to suppress a crime scene video and autopsy photos of Girlfriend. The court denied both motions.

¶9 Detective passed away before trial, but the State played the audio recording of his interview with Smith for the jury. The State also called as a witness the police officer who transported Smith to jail after his interview (Officer). Defense counsel sought to cross-examine Officer regarding a conversation he had with

_____

2. The aggravated assault was based on Smith's action of pointing his gun at Friend.

Smith in which he asked Smith "what he felt as he was committing the act of murder." Smith explained to Officer that "he felt he needed to complete the act because he didn't know what [Ashton] would do to him if he didn't." When Officer asked Smith "what he meant," Smith responded, "[Ashton] just shot two people. So I thought maybe he would shoot me." The State objected to this line of questioning as being beyond the scope of Officer's direct examination, and defense counsel agreed to defer questioning about the conversation until Smith presented his defense.

¶10    When it came time for Smith to present his defense on day five of the trial, he began by calling Officer as a witness, but the State objected on hearsay grounds to Officer testifying regarding his conversation with Smith. Smith asserted that the conversation should be admitted under the rule of completeness. *See* Utah R. Evid. 106. The court initially sustained the State's objection, but upon receiving further information that same day, it indicated that it would reexamine the issue if defense counsel provided additional relevant authority. Defense counsel did not raise the issue again until after the jury was excused on day seven of the trial. At that point, the court heard additional argument and took the State's objection to Officer's testimony under advisement. The next day, following further discussion of the matter off the record, the State withdrew its objection, and Officer was permitted to testify regarding his conversation with Smith.

¶11    Smith moved for a mistrial on the grounds that the delayed ruling had "an unfair effect upon the defendant." Because Officer's statement was admissible under the rule of completeness, Smith argued, the jury should have been permitted to hear that testimony at the same time it heard the audio recording of Smith's police interrogation. The court denied Smith's motion because it determined that any delay was invited by Smith, who did not argue that the rule of completeness was applicable at the time of Officer's direct examination and then

delayed pursuing the issue when the court indicated its willingness to reconsider its initial ruling.

¶12    In seeking to establish a basis for his fear of Ashton and his belief that Ashton might kill him if he did not kill Girlfriend, Smith also sought to present evidence of "jailhouse kites"—illicit letters exchanged by prison inmates—written by Ashton while he was incarcerated after the killings, as well as evidence of a confrontation Ashton had with a friend outside a gas station on the day of the killings, in which he threatened to kill his friend and another friend if they crossed Ashton.

¶13    The court examined each line of the kites in detail and required that they be redacted to exclude material that the court deemed to be either hearsay or irrelevant. The court also excluded the evidence of Ashton's earlier confrontation, determining it was irrelevant because there was no evidence that Smith was aware of the confrontation at the time of the killings.

¶14    Relying on evidence that he felt threatened by Ashton, Smith requested that the jury be given an instruction on the affirmative defense of compulsion. However, the court refused to give such an instruction because it determined that the evidence presented at trial was not sufficient to support the defense.

¶15    Following trial, the jury acquitted Smith of the aggravated assault charge. The jury found Smith guilty of aggravated murder,[3] but the jury also found that he committed the murder

---

3. The jury found three separate aggravators—that "the homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which two or more persons were killed"; that "the homicide was committed incident to an act, scheme, course of conduct, or criminal episode during which the actor attempted to commit Kidnapping"; and that "the homicide was committed in an especially heinous, atrocious,

(continued…)

while under extreme emotional distress. His conviction was therefore reduced from aggravated murder to murder. *See* Utah Code Ann. § 76-5-205.5(5)(b)(i) (LexisNexis 2017). Smith now appeals.

ISSUES AND STANDARDS OF REVIEW

¶16 Smith first argues that the trial court erred in denying his motion to suppress his police interview. "We review a district court's ruling on a motion to suppress for correctness, and we review its factual findings in support of its ruling for clear error." *State v. Gardner*, 2018 UT App 126, ¶ 11, 428 P.3d 58. "When a trial court bases its ultimate conclusions concerning the waiver of defendant's *Miranda* rights, upon essentially undisputed facts, in particular the transcript of an officer's colloquy with defendant, its conclusions present questions of law which we review under a correction of error standard." *State v. Gutierrez*, 864 P.2d 894, 898 (Utah Ct. App. 1993) (quotation simplified).

¶17 Second, Smith asserts that the trial court erred in declining to instruct the jury on the affirmative defense of compulsion. "[W]e review a court's ruling on a proposed jury instruction for correctness . . . ." *State v. Maestas*, 2012 UT 46, ¶ 148, 299 P.3d 892.

¶18 Third, Smith challenges the court's denial of his motion in limine to exclude the crime scene video and autopsy photos under rule 403 of the Utah Rules of Evidence. We review a court's ruling made pursuant to rule 403 for abuse of discretion. *Met v. State*, 2016 UT 51, ¶ 36, 388 P.3d 447.

---

(…continued)
cruel, or exceptionally depraved manner." *See* Utah Code Ann. § 76-5-202 (LexisNexis Supp. 2018).

¶19    Fourth, Smith argues that the court erred in redacting the jailhouse kites and excluding evidence of the confrontation at the gas station. "Although the admission or exclusion of evidence is a question of law, we review a trial court's decision to admit or exclude specific evidence for an abuse of discretion." *State v. Cruz-Meza*, 2003 UT 32, ¶ 8, 76 P.3d 1165.

¶20    Finally, Smith argues that the trial court erred in denying his motion for mistrial. "A trial court's decision to grant or deny a mistrial will not be disturbed on appeal absent an abuse of discretion." *State v. Harris*, 2004 UT 103, ¶ 21, 104 P.3d 1250.


ANALYSIS

I. Motion to Suppress

¶21    Smith argues that the trial court erred in denying his motion to suppress his police interview. Smith raises two arguments in support of this assertion, both concerning his right to counsel.

A.    Adequacy of *Miranda* Warnings

¶22    Smith first argues that Detective's warning did not adequately inform him of his right to have an attorney appointed prior to any questioning. *Miranda v. Arizona*, 384 U.S. 436 (1966), requires that a person subject to custodial interrogation be informed "that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479. Smith asserts that Detective's statement, "The courts will appoint you a lawyer if you really need one . . . if it comes to that," did not adequately inform him of his right to a lawyer during questioning. Instead, Smith asserts, the statement conditioned his right "upon the occurrence of a future event or some court's determination that he 'really needed' an attorney."

¶23 However, *Miranda* warnings need not be repeated word for word. In reviewing the adequacy of *Miranda* warnings, our "inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (quotation simplified). With respect to the right to counsel, a statement indicating that counsel will be appointed at a future time will not be considered erroneous so long as the warnings as a whole "apprise the accused of his right to have an attorney present if he [chooses] to answer questions." *Id.* at 204–05.

¶24 For example, in *Duckworth*, a suspect was informed,

> You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.

*Id.* at 198 (quotation simplified). The Supreme Court rejected the assertion that the "'if and when you go to court' language suggested that only those accused who can afford an attorney have the right to have one present before answering any questions." *Id.* at 203 (quotation simplified). Rather, the Court determined that the warnings, read as a whole, satisfied *Miranda* because they informed the suspect of his right to consult with a lawyer prior to questioning and to have a lawyer present during questioning. *See id.* at 203–05.

¶25 Our supreme court reached a similar conclusion in examining a *Miranda* warning that stated, "If you cannot afford an attorney, you have the right to have an attorney appointed for you by the court at a later date." *State v. Strain*, 779 P.2d 221, 223 (Utah 1989) (quotation simplified). The court determined that informing a defendant "about the immediate unavailability of

court-appointed counsel for him" did not carry "any implication that he was required to submit to an interview with law enforcement officers without the presence of appointed counsel if he could not afford one." *Id.* Because the suspect was also informed that he had the right to the presence of an attorney during questioning, the reference to the actual *appointment* of counsel taking place at a later date did not link the *right* to counsel to a later date or a court appearance. *See id.* at 224.

¶26   The *Miranda* warnings here were similar to those in *Duckworth* and *Strain*. Smith was explicitly informed, "You have the right to an attorney and to have one present with you *while you're being questioned*." (Emphasis added.) Like the warning in *Strain*, Detective's statement regarding appointed counsel—"The courts will appoint you a lawyer if you really need one . . . if it comes to that"—related to the procedure and timing of appointing counsel, not Smith's right to have counsel, which had already been explicitly confirmed. Smith was informed of the right to remain silent and the right to have counsel present for questioning; nothing in the warnings implied that "he was required to submit to an interview with law enforcement officers without the presence of appointed counsel if he could not afford one," *see Strain*, 779 P.2d at 223. Thus, we agree with the trial court that Detective's *Miranda* warnings adequately informed Smith of his right to receive appointed counsel prior to questioning.[4]

B.     Request for Counsel

¶27   Second, Smith argues that his statement to Detective that he could not afford an attorney constituted an ambiguous

---

4. Beyond his assertions regarding the adequacy of the warnings, Smith makes no argument on appeal asserting that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights by electing to answer Detective's questions after receiving the warnings.

invocation of his right to counsel and that Detective should have clarified the request before proceeding with any questioning. When a suspect invokes his right to counsel during custodial interrogation, "the interrogation must cease until an attorney is present" "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 485 (1981) (quotation simplified). Interpreting the Fifth Amendment to the United States Constitution, our supreme court held in *State v. Wood*, 868 P.2d 70 (Utah 1993), that when such an invocation of the right to counsel is "ambiguous or equivocal . . . , questioning with respect to the subject matter of the investigation must immediately stop, and any further questioning must be limited to clarifying the request." *Id.* at 85.

¶28 The year after our supreme court issued its decision in *Wood*, the United States Supreme Court took up the issue and held that, at least with respect to a suspect who has initially waived his or her *Miranda* rights, officers are not required to cease questioning where the suspect's "reference to an attorney . . . is ambiguous or equivocal." *Davis v. United States*, 512 U.S. 452, 459 (1994). In light of this holding, our supreme court was asked in *State v. Leyva*, 951 P.2d 738 (Utah 1997), to assess the continuing validity of *Wood*. Although the court disavowed *Wood* "to the extent that *Wood* may be read more broadly than *Davis*," it held that *Wood* continued to apply to pre-waiver requests for counsel. *Id.* at 743.

¶29 Subsequently, in *Berghuis v. Thompkins*, 560 U.S. 370 (2010), the United States Supreme Court again examined the issue of ambiguous and equivocal invocations of *Miranda* rights, this time in the context of the right to remain silent. Relying on *Davis*, the Supreme Court determined, in the pre-waiver context, that invocation of either the right to counsel or the right to remain silent must be unequivocal. *See id.* at 381 (explaining that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel"). The Court

reasoned that "[t]reating an ambiguous or equivocal act, omission, or statement as an invocation of *Miranda* rights" would contribute only "marginally to *Miranda*'s goal of dispelling the compulsion inherent in custodial interrogation" while placing "a significant burden on society's interest in prosecuting criminal activity." *Id.* at 382 (quotation simplified). Because the *Berghuis* Court held that invocation of the right to counsel must be unequivocal in both the pre- and post-waiver contexts,[5] *Berghuis* effectively overturns our supreme court's holding in *Leyva*.

¶30   Smith nevertheless asserts that we should interpret the Utah Constitution as requiring the heightened *Wood–Leyva* standard with respect to pre-waiver invocations of *Miranda* rights. But the Utah Supreme Court "has never specifically held that *Miranda*-type warnings are required under the Utah Constitution." *Leyva*, 951 P.2d at 743 (quotation simplified). Indeed, our supreme court has repeatedly disavowed statements of law regarding *Miranda* "to the extent" that they "afforded broader protections than those available under United States Supreme Court decisions applying *Miranda* law." *Id.* (quotation simplified); *accord State v. Mirquet*, 914 P.2d 1144, 1147 n.2 (Utah 1996). Smith asserts that departing from *Leyva* now would "undermine rights long enjoyed in Utah." However, the analysis in both *Wood* and *Leyva* interpreted only the federal Constitution, not the Utah Constitution. *See Leyva*, 951 P.2d at 743 ("In determining the content and scope of *Miranda*-based protections, we have looked to the United States Constitution as interpreted by the United States Supreme Court rather than to the

_____

5. Although the Supreme Court did not engage in an explicit discussion of the distinction between pre- and post-waiver invocation of the right to counsel, it was clearly aware that its decision effectively extended *Davis* to the pre-waiver context, as the four-justice dissent distinguished *Davis* for just this reason. *See Berghuis v. Thompkins*, 560 U.S. 370, 407–08 (2010) (Sotomayor, J., dissenting).

Constitution of Utah."). And their holdings have since been contradicted by the United States Supreme Court. *See Berghuis*, 560 U.S. at 381. Thus, just as our supreme court in *Leyva* determined that it was "constrained to follow *Davis*" by disavowing any contradictory implications in *Wood*, we are now constrained to follow *Berghuis* in determining that the invocation of the right to counsel in the pre-waiver context must be unequivocal. *See id.* Smith's ambiguous reference to counsel therefore did not require Detective to stop his questioning or seek clarification of Smith's intent. Accordingly, the trial court did not err in denying Smith's motion to suppress.

## II. Compulsion Instruction

¶31 Smith next challenges the trial court's refusal to give the jury an instruction regarding compulsion. "Compulsion is an affirmative defense." *State v. Dozah*, 2016 UT App 13, ¶ 16, 368 P.3d 863.

> When a criminal defendant requests a jury instruction regarding a particular affirmative defense, the court is obligated to give the instruction if evidence has been presented—either by the prosecution or by the defendant—that provides any reasonable basis upon which a jury could conclude that the affirmative defense applies to the defendant.

*State v. Low*, 2008 UT 58, ¶ 25, 192 P.3d 867. "However, a court need not instruct the jury on the requested affirmative defense where the evidence is so slight as to be incapable of raising a reasonable doubt in the jury's mind as to whether the defendant acted in accordance with that affirmative defense." *State v. Burke*, 2011 UT App 168, ¶ 81, 256 P.3d 1102 (quotation simplified).

¶32 With respect to the affirmative defense of compulsion, Utah law provides,

> A person is not guilty of an offense when he engaged in the proscribed conduct because he was coerced to do so by the use or threatened imminent use of unlawful physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would not have resisted.

Utah Code Ann. § 76-2-302(1) (LexisNexis 2017). For a threat to be "imminent," it must "appear that it had been communicated to the defendant that he would be subjected to physical force presently." *State v. Harding*, 635 P.2d 33, 35 (Utah 1981). Further, the force or threat of force must be "specific" and leave the defendant with "no reasonable alternative to the commission of the crime charged." *State v. Maama*, 2015 UT App 234, ¶ 14, 359 P.3d 1266 (quotation simplified).

¶33   Here, the only evidence of compulsion presented to the jury was that Smith witnessed Ashton shoot two people immediately before Ashton instructed Smith to "take out" Girlfriend. When questioned by police, Smith stated that "he felt he needed to complete the act because he didn't know what [Ashton] would do to him if he didn't" and then clarified, "He just shot two people. So I thought *maybe* he would shoot me." (Emphasis added.)

¶34   This evidence was insufficient for the jury to find that Smith murdered Girlfriend because he was coerced to do so. That is, no evidence was presented to show that Ashton communicated a specific threat to Smith either verbally or otherwise. Smith's supposition that "maybe" Ashton would shoot him if he did not comply with Ashton's instruction to "take out" Girlfriend does not evidence such a threat. Smith asserts that a threat could be inferred from Ashton's violent propensities toward friends and acquaintances that cross him, as evidenced by Ashton's interaction at the gas station and the sentiments expressed in his jailhouse kites. But even accepting

the premise that a specific threat sufficient to satisfy the statute could be inferred from Ashton's violent history and character, there was no evidence presented or proffered suggesting that Smith was aware of these propensities at the time he killed Girlfriend.[6] Thus, the jailhouse kites—written after the killings—and the gas station confrontation—which Smith was not aware of at the time of the killings—even if admitted, could not have provided sufficient evidence of compulsion. There was therefore no "reasonable basis" for the jury to conclude that Smith was compelled by threat to murder Girlfriend.[7] *See Low*, 2008 UT 58,

---

6. Smith's contention that a threat sufficient to satisfy the compulsion defense could be inferred from previous conduct is not supported by the plain language of the statute or by Utah case law interpreting the statute. *See, e.g.*, *State v. Harding*, 635 P.2d 33, 34 (Utah 1981) (requiring that a threat of imminent use of unlawful force be communicated); *State v. Aranda*, 2002 UT App 52U, para. 8 ("We fail to see how evidence regarding the violent criminal history and character of defendant's co-perpetrators would have established an 'essential element' to defendant's compulsion defense. This defense requires that defendant or the victims at the time were faced with a specific, imminent threat of death or serious bodily harm if defendant did not assist her co-perpetrators in committing these crimes . . . ." (quotation simplified)). And even if awareness of violent character could lend support to a compulsion defense, such awareness would likely undermine the defense by also serving as evidence that the defendant had knowingly put himself in a situation in which he would be subject to duress, *see infra* note 7.

7. The State also asserts that a compulsion defense was unavailable to Smith because he "intentionally, knowingly, or recklessly place[d] himself in a situation in which it is probable that he will be subjected to duress." *See* Utah Code Ann. § 76-2-302(2) (LexisNexis 2017). In light of our determination that the evidence of compulsion was insufficient to require a jury instruction, we need not address this assertion.

¶ 25. Accordingly, the trial court correctly denied Smith's request for a compulsion instruction.

III. Crime Scene Video and Autopsy Photos

¶35     Smith next challenges the trial court's denial of his motion in limine to exclude the crime scene video and autopsy photos on the ground that they were unfairly prejudicial. Rule 403 of the Utah Rules of Evidence permits exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Utah R. Evid. 403. "Evidence is unfairly prejudicial when it has an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Thompson*, 2017 UT App 183, ¶ 26, 405 P.3d 892 (quotation simplified). Rule 403 is an "inclusionary rule." *Id.* (quotation simplified). And it therefore "imposes the heavy burden not only to show that the risk of unfair prejudice is greater than the probative value, but that it substantially outweighs the probative value." *Id.* (quotation simplified).

¶36     Smith argues that the photographs and video were unduly prejudicial because the photographs showed "gaping wounds" and the photographs and video "depict[ed] quantities of blood spray, spatter, and pooling on the walls, cabinets, toilet, bathtub, and floor of the master bathroom." He further asserts that the State used the evidence for the purpose of inflaming the jury rather than for a proper, relevant purpose. And he maintains that because evidence of Girlfriend's injuries was established by other medical evidence at trial, the photographs and crime scene video were unnecessary and should have been excluded.

¶37     While the photographs and video contained disturbing images, the trial court did not exceed its discretion in concluding that their probative value was not substantially outweighed by the danger of unfair prejudice. Contrary to Smith's assertion, the photos and video were relevant to prove one of the aggravating circumstances charged by the State—that the murder was

committed "in an especially heinous, atrocious, cruel, or exceptionally depraved manner." Utah Code Ann. § 76-5-202(1)(r) (LexisNexis 2017). This aggravator "must be demonstrated by physical torture, serious physical abuse, or serious bodily injury of the victim before death." *Id.* The crime scene video and photographs were highly relevant to this aggravator because they provided evidence that the victim's injuries were inflicted with the "intent to cause wholly unnecessary suffering to the victim[]."[8] *See State v. Tuttle*, 780 P.2d 1203, 1218 (Utah 1989). And the fact that evidence of Girlfriend's wounds could have been established by other means is not, alone, "a basis for depriving the prosecution the opportunity of profiting from the legitimate moral force of its evidence in persuading a jury." *State v. Gulbransen*, 2005 UT 7, ¶ 37, 106 P.3d 734 (quotation simplified), *abrogated on other grounds by Met v. State*, 2016 UT 51, 388 P.3d 447.

¶38 The jury was tasked with assessing the heinousness of the crime committed against Girlfriend, which necessarily required the jury to evaluate the extent and nature of the injuries Smith inflicted on Girlfriend. The photographs and video accurately depicted those injuries. While the photos and video may have been graphic, "the disturbing nature of the [images] is a function of the injuries themselves, not the result of a deliberate attempt

---

8. Smith's argument appears to assert that the photos and videos were not relevant because his attack on Girlfriend was not as prolonged as other cases involving torture—Girlfriend was not bound, she was not sexually molested, and her injuries were all serious enough to contribute to her death. *Cf. State v. Decorso*, 1999 UT 57, ¶¶ 4–6, 993 P.2d 837, *abrogated by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. But if anything, this point enhances the relevance of the photographic and video evidence; where the heinousness of the crime was due solely to the "number and nature" of the injuries, the State's need to share a visual depiction of those injuries with the jury was even greater than in a case where a victim was tortured over a long period of time.

by the State to distort or highlight the extent of the injuries." *See State v. Stapley*, 2011 UT App 54, ¶ 16, 249 P.3d 572. Further, the trial court made efforts to minimize the prejudicial impact of the images by ordering that all but one of the photographs be displayed to the jury in black and white. In light of these circumstances, we cannot say that the trial court exceeded its discretion in admitting the crime scene video and photographs.[9]

### IV. Exclusion of the Jailhouse Kites and Gas Station Altercation

¶39    Smith also asserts that the court erred in excluding the jailhouse kites and evidence of Ashton's altercation at the gas station. However, even assuming that this evidence was erroneously excluded, its exclusion had no likelihood of affecting the outcome of the case. This evidence was relevant only to show Ashton's propensity for violence, which Smith hoped would establish the mitigating factor of extreme emotional distress and Smith's defense of compulsion. *See supra* ¶ 34. But the jury found special mitigation as a result of Smith's extreme emotional distress even without this evidence, and we

---

9. It is also worth noting that it is not reasonably likely that the jury would have acquitted Smith without the crime scene video and photographs in light of Smith's own confession in his police interview—which we have determined to be admissible—and the unavailability of a compulsion defense. And there is also no reasonable likelihood that exclusion of this evidence would have prevented the jury from finding that the murder was aggravated, since it found two more aggravating factors in addition to the heinousness factor. *See* Utah Code Ann. § 76-5-202 (LexisNexis 2017) (indicating that aggravated murder can be based on "any" of a number of aggravating circumstances). Further, the photographic evidence did not undermine Smith's mitigation argument, because the jury found that Smith's actions were mitigated by extreme emotional distress even having seen the evidence. We can therefore conceive of no better outcome for Smith had the evidence been excluded.

have determined that the evidence was insufficient to support Smith's compulsion defense. Therefore, the exclusion of this evidence ultimately had no impact on the outcome of the proceedings. *See State v. Evans*, 2001 UT 22, ¶ 20, 20 P.3d 888 (defining harmless error as "an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings").

## V. Motion for Mistrial

¶40    Finally, Smith challenges the trial court's ruling on his motion for mistrial, but he makes no attempt to address the basis for the trial court's ruling. Although acknowledging that the trial court denied his motion for mistrial on the ground that any error was invited, Smith's entire argument focuses on the appropriate timing for presentation of evidence under the rule of completeness.[10] Because Smith has not addressed "the primary

---

10. We have previously observed that rule 106 is "a rule of timing." *State v. Sanchez*, 2016 UT App 189, ¶ 23, 380 P.3d 375, *aff'd in part, vacated in part*, 2018 UT 31, 422 P.3d 866. Rule 106 provides, "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, *at that time*, of any other part—or any other writing or recorded statement—that in fairness ought to be considered *at the same time*." Utah R. Evid. 106 (emphasis added). Given the specific timing requirements outlined by the rule of completeness, we question whether Smith's invocation of rule 106 was timely. Unlike the defendant in *Sanchez*, who invoked the rule of completeness in his cross-examination of a police detective after a portion of his police interview was admitted through that detective's testimony, Smith did not raise the rule of completeness when his police interview was first introduced. Instead, he conceded that his attempted cross-examination of Officer was beyond the scope of the State's direct examination and agreed to wait to question Officer about Smith's allegedly exculpatory statements until his case-in-chief, at which point he

(continued…)

basis for the court's decision," he has not adequately briefed this issue. *See State v. Steed*, 2017 UT App 6, ¶ 20, 391 P.3d 373 ("We will not assume a party's burden of argument and research." (quotation simplified)). In any event, our determination that Smith was not entitled to an instruction on compulsion makes any delay in admitting Officer's statement harmless.[11] *See supra* ¶ 34.

CONCLUSION

¶41 The trial court did not err in denying Smith's motion to suppress his police interview, because he received adequate *Miranda* warnings and Detective was not required to cease questioning based on Smith's ambiguous request for counsel. The trial court did not err in denying Smith's request for a jury instruction on compulsion, because the evidence was insufficient to establish a basis for the jury to be instructed on that affirmative defense. Further, the court did not exceed its discretion in admitting the crime scene video and photographs. Because Smith was not entitled to a compulsion instruction, he also cannot establish harm with respect to his challenges to the court's exclusion of the jailhouse kites and the gas station evidence or its denial of his motion for mistrial. Thus, we affirm Smith's conviction.

_____

(…continued)
invoked the rule of completeness in response to the State's hearsay objection. We ultimately need not address this issue, however, because the State withdrew its objection at trial.

11. Smith conceded as much at oral argument.